## Flanders, Appellant, *v.* Snare.

*Negotiable instrument—Bill of exchange—Indorsement—Rubber stamp —Act of May 16, 1901, P. L. 194.*

There is nothing in the Act of May 16, 1901, P. L. 194, styled the "Negotiable Instruments Law," which prevents the use of a rubber stamp in the indorsement of checks, drafts and notes.

Argued May 13, 1908. Appeal, No. 39, April T., 1908, by plaintiff, from order of C. P. Lawrence Co., March T., 1906, No. 3, refusing to take off nonsuit in case of Lewis E. Flanders v. J. W. Snare. Before RICE, P. J., PORTER, HENDERSON, MORRISON, ORLADY, HEAD and BEAVER, JJ. Reversed.

Assumpsit against the acceptor of a bill of exchange. Before WM. E. PORTER, P. J.

The facts are stated in the opinion of the Superior Court.

*Error assigned* was refusal to take off nonsuit.

*W. H. Falls,* for appellant, cited: Commercial Nat. Bank v. Armstrong, 39 Fed. Repr. 684; Robb v. Penna. Co., 3 Pa. Superior Ct. 254; Mayers v. McRimmon, 140 N. Car. 640 (53 S. E. Repr. 447).

*J. Norman Martin,* with him *A. Martin Graham,* for appellee.—Title to the paper passed to Flanders only by indorsement, so that to prove his title he must prove indorsement: McCormick v. Trotter, Indorsee of Lynn, 10 S. & R. 94.

OPINION BY HEAD, J., July 15, 1908:

The plaintiff brings this action as the indorsee of a bill of

exchange which had been accepted by the defendant, who, on the maturity of the bill and its presentation, refused payment. Upon the trial, the learned court below entered a compulsory nonsuit and subsequently refused to take it off. We must, therefore, for the purposes of this appeal, consider as verity every material fact that could have been found from the testimony adduced by the plaintiff. They may be thus briefly stated. One Elmer L. Rice was the sole owner of a wholesale jewelry establishment in the city of Detroit and conducted his business under the trade name of American Standard Jewelry Company. In June, 1904, the defendant purchased a bill of goods from the jewelry company, and in payment of the price accepted six bills of exchange, each of like amount, payable respectively in 3, 5, 7, 9, 11 and 12 months after date, and delivered them to the company. Four of these acceptances, along with a quantity of other negotiable paper, were purchased from the jewelry company, by Flanders, the plaintiff. He was in no way connected with the company and his purchase was for value, before maturity, in the ordinary course of business and without notice of any defense on the part of the acceptor. Three of the four acceptances purchased by the plaintiff were paid by the defendant as they fell due.

The jewelry company was not only willing to indorse all of the paper sold to the plaintiff, but actually did indorse it at the time it was delivered, as Mr. Rice himself testifies. The indorsement was in the ordinary form, but was placed on the paper by the use of a rubber stamp prepared for that purpose. When, after proof of all of the facts above stated, the plaintiff offered in evidence the accepted bill, it was rejected by the learned trial court because the indorsement being in "printed letters either by rubber stamp or type it is not such an indorsement as is contemplated by law." This conclusion seems to have been predicated largely on his construction of sections 30 and 31 of the Act of May 16, 1901, P. L. 194, commonly known as the "Negotiable Instruments Act." The first named section provides that "an instrument is negotiated when it is transferred from one person to another in such manner as to

constitute the transferree the holder thereof. If payable to order, it is negotiated by the indorsement of the holder, completed by delivery." Section 31 provides: "The indorsement must be written on the instrument itself, or upon a paper attached thereto. The signature of the indorser, without additional words, is a sufficient indorsement."

If we are obliged to say that, by the use of the language quoted, the legislature intended to forbid the use of such a simple and practical mechanical aid as a rubber stamp, in the indorsement of the thousands of checks, drafts, notes, etc., by which the ordinary daily business of the country is conducted, the effect of such a declaration on the commercial world would be both startling and disastrous. We can find nothing in the act itself, nor in the conditions that existed before and since its enactment, to justify us in so declaring. In its very first words the act prescribes that to be negotiable an instrument "must be in writing and signed by the maker or drawer." Of course, the legislature knew that the necessities of trade had long before brought about the fact that almost the entire bodies of the various forms of commercial contracts in ordinary use were printed. But it would hardly be contended that after the maker of a note or the drawer of a bill had, for his own convenience and in accord with almost universal usage, selected such printed form and launched his obligation on the sea of commerce, he could thereafter be heard to deny his responsibility for it on the ground that the instrument was not "in writing" within the meaning of the act of assembly. We think the legislature has expressly declared otherwise. In the final section of the act the various terms used are defined and it is there stated that "in this act, unless the context otherwise requires, 'written' includes printed, and 'writing' includes print." In section 17 of the act the rules that are to govern, where the language of the instrument is ambiguous, are laid down, and clause 4 declares that "where there is a conflict between the written and printed provisions of the instrument the written provisions prevail." It is, therefore, clear that the legislature has expressly recognized the fact that the primary obligation of a maker or acceptor of a

negotiable instrument is "in writing" within the meaning of the act, even though it be chiefly in print. If so, what is there in the nature of the secondary contract of indorsement, many of which may be ingrafted on a single primary one, to lead us to the conclusion that the legislature intended that the words "writing" or "written" should be interpreted in one way when applied to the instrument itself, and in a much more restricted sense when dealing with the subsequent indorsements that may be found thereon? We find nothing in the context of that portion of the act dealing with indorsements, to warrant us in rejecting the definitions laid down by the legislature itself.

In construing an act of the legislature, dealing with a subject like the one now under consideration, it is well to keep in mind what was said by COULTER, J., in Hill v. Scott, 12 Pa. 168, in deciding the evidential value of book entries written by a lead pencil, viz.: "The law must accommodate itself to the business habits, convenience and customs of the country." If it were necessary to pursue this branch of the case further, it would be easy to show that in the interpretation placed by the legislature upon its own language, it is in harmony not only with "the business habits and customs of the country," but with the almost uniform construction of the same words adopted by the courts in the various states of the Union. Many of them may be found collated in 30 Am. & Eng. Ency. of Law, 1303. The reasoning of the opinions in Myers v. Vanderbelt, 84 Pa. 510, and Robb v. Penna. Co., 3 Pa. Superior Ct. 254, would, we think, certainly lead to the conclusion that an indorsement of a negotiable instrument made by the use of a rubber stamp, would have been valid and binding on the indorser who made it, before the passage of the act of 1901, and the legislature did not intend to make any change in that respect.

Of course, we are not to be understood as saying that an indorsement made by the use of a rubber stamp, any more than one made in manuscript, proves itself. In either case the maker or acceptor, when called upon to pay by one claiming to be a lawful holder by virtue of such indorsement, may demand proper proof of the genuineness and authenticity of the

indorsement. In such a contract, as in every other, the intention of the parties to bind themselves is the very life of the contract.

In this case, both the indorser and indorsee testified that the former sold and the latter bought a piece of commercial paper in the usual course of business; that the former intended to indorse it and did indorse it by the use of the stamp, and the latter accepted it as a duly indorsed and transferred instrument. If their testimony was truthful, no better evidence, perhaps no other evidence, could be produced to prove that the indorser had adopted that method of entering into the contract of indorsement.

The ownership of a chattel is a mixed question of law and fact. The plaintiff should be permitted to prove and in this case was permitted to offer evidence of all of the material facts upon which the conclusion of ownership of the acceptance might be predicated. More than this he could not ask. The first and second assignments are therefore dismissed, but for the reasons indicated the third, fourth and sixth must be sustained.

The order refusing to strike off the compulsory nonsuit is reversed, the nonsuit is set aside, and a procedendo awarded. The costs of this appeal to be paid by appellee.